**IRWIN et al. v. SWINNEY et al.**

No. 1284.

District Court, W. D. Missouri, W. D.
Dec. 20, 1930.

Ben R. Estill, A. N. Gossett, Henry L. Jost, Claude S. Gossett, and Arthur Miller, all of Kansas City, Mo., and Wm. Seward Allen, of New York City, John T. Harding, of Kansas City, Mo., for plaintiffs.

Ryland, Stinson, Mag & Thomson, of Kansas City, Mo., for defendant executors and trustees.

John S. Wright and Leslie A. Welch, both of Kansas City, Mo., for defendant Stratton Shartel, Attorney General.

McCune, Caldwell & Downing, R. R. Brewster, Harkless & Histed, Winger, Reeder, Barker, Gumbiner & Hazard, Madden, Freeman & Madden, Hogsett & Boyle, Langworthy, Spencer & Terrell, Scarritt, Jones & North, and Alfred Gregory, all of Kansas City, Mo., for interveners.

OTIS, District Judge.

In this case [1] applications for allowances in compensation for legal services rendered have been made by the firm of Ryland, Stinson, Mag & Thomson, who appeared for the executors and trustees, by Messrs. Wright, Welch, Woodbury, and Meyer, who appeared as attorneys for the Attorney General, by the firm of McCune, Caldwell & Downing, who appeared as attorneys for the Women's Christian Association, one of the intervening defendants, and by Mr. James H. Harkless, who appeared as attorney for the George H. Nettleton Home for Aged Women, another of the intervening defendants. What allowances, if any, should be made to these attorneys is now for decision, and is the subject-matter of this memorandum and order. A discussion of the matter may well be prefaced by a preliminary statement.

[1] Harry Wilson Loose in his will bequeathed to trustees, to be expended for charitable purposes in Kansas City, Mo., the residue of his estate which, at the time of the trial of this case, amounted to approximately $4,000,000. Collateral heirs at law of Loose, being nine of his cousins, attacked by bill in equity the charitable trust sought to be established by the testator, upon the ground that it was not a valid charitable trust and that they were lawfully entitled to the fund. The case was decided adversely to plaintiffs and favorably to the defendants. The opinion is reported in (D. C.) 44 F.(2d) 172. Following the decision of the case, the attorneys who had represented the trustees and the Attorney General of Missouri, and attorneys representing various intervening charitable institutions in Kansas City, made applications for allowances in compensation for legal services rendered by them in the case.

An application for an allowance having been made by the attorneys representing the Attorney General, and anticipating that other applications would be made, I directed by order that all attorneys who intended to ask for allowances should present such applications on the 3d day of December, 1930, so that they might be heard together. It was my view that the value of legal services rendered to the trust established by the Loose will should be determined as one matter and that then the amount representing the total value of such services should be apportioned among the attorneys entitled to compensation in proportion to the reasonable value of the services of each. It was my view also that the hearing as to the value of the services rendered should not be of an ex parte character at which the only testimony offered was that of attorneys called by the applicants for allowances. It seemed to me that, where the allowances asked might well be expected to be large, they should be based upon carefully considered and, if possible, unsolicited testimony. To insure a hearing of such a character, I proposed to the trustees and also to the Attorney General that they employ counsel other than the attorneys personally interested in allowances who would cause to be called disinterested attorneys to give testimony, and who would cross-examine other attorneys called by the interested parties. Out of all the testimony thus resulting, I hoped to have a satisfactory evidentiary basis for allowances.

Before the date set for the hearing, the trustees and the attorneys for the trustees (and they spoke also, they assured me, for the attorneys who represented the Attorney General) proposed, in lieu of the plan I had suggested, that I appoint three or more members of the Kansas City bar and empower them to carefully investigate the work done and services rendered by attorneys in this case, and, upon the basis of their investigation, give me their expert opinions as to what would be reasonable allowances. The trustees and others who made this proposal did so because it was their view that the cause of charitable trusts generally would be injured if at a public hearing witnesses would testify in support of what might generally be regarded as exorbitant allowances, even though only reasonable allowances finally were made. I thought this proposal was meritorious, and I the more readily adopted it since it clearly appeared that all of the attorneys asking allowances, or at least those principally interested in the matter of allowances, favored this plan, and I may add

that none of the attorneys who have made applications for allowances has at any time expressed any disapproval of the plan adopted or suggested that the method usually employed and the one I first contemplated was not inferior to the one proposed to me by the trustees and others. .

Adopting the proposal made to me by the trustees and the attorneys mentioned, I selected three outstanding members of the bar of this court, Messrs. Cyrus Crane, Henry M. Beardsley, and Albert I. Beach. In selecting them I had in mind a type of lawyer. I wanted not only outstanding members of the bar who had been successful in the practice of their profession and who were generally recognized as successful practioners, but who also, by reason of their character and public services, commanded the respect and admiration of all lawyers and all citizens. Two of the men I selected had been presidents of the Kansas City Bar Association. Two of them had been mayors of Kansas City. Each of the three was known by every one to be animated in all matters by a high sense of justice and public duty. By court order I authorized them to take testimony under oath as to the services which had been rendered by attorneys, and to report to me what in their judgment were the proper principles to be applied in the fixing of allowances, and to report to me also what in their judgment were proper allowances to be made in this case. Thereupon they made a most careful investigation, taking testimony for more than two days, and then diligently reviewing that testimony and the law applicable thereto, and finally agreeing upon a recommendation as to what was a proper total allowance and as to who were entitled to participate therein. The understanding of all was that a transcript of the testimony taken by these gentlemen should be received as the testimony in this matter and that their expert opinions as to what were reasonable allowances should be the only expert opinions received. At a hearing on the 6th day of December, 1930, the transcript was introduced, the report was received, an opportunity was given for such other testimony as the parties might desire to offer. None other was offered, and none other was received.

It was the view of the committee of lawyers appointed by me that the attorneys representing the Attorney General as such were entitled to no compensation out of the trust fund, and that the attorneys for the intervening defendants also were entitled to no compensation from the trust fund. It was

their view, however, that the attorneys representing the Attorney General were, in a true sense, really retained by the trustees as associate counsel with the firm of Ryland, Stinson, Mag & Thomson, which principally represented the trustees, and that in that capacity they were entitled to compensation. In the estimation of the committee, and such was their expert testimony, the total amount that should be allowed for legal services rendered to the trust was $40,000.

The amount recommended is very much less than the amount to which the interested attorneys feel they are entitled. It was stated in evidence by them at the hearing before the committee that the minimum which in their view the attorneys for the trustees and the attorneys for the Attorney General should receive was $100,000. Their view was that the amount allowed certainly should not be less than $100,000, and that $150,000 would be quite fair and reasonable. The Attorney General of the state, whose duty it was and is to protect and conserve this and similar charitable trusts, testified through one of his assistants that in his judgment a fee of not more than $100,000 was reasonable.

It is my duty to determine what the allowances should be. It is scarcely necessary to say that no duty which a judge is called upon to perform is more distressing. I should be glad indeed if I might honorably avoid fixing allowances for attorneys in this and in all other matters.

But I cannot take the easy course of allowing whatever may be asked. The mere fact that there is none to oppose allowances makes my duty of seeing to it that the allowances shall be not more than reasonable the more imperative. Courts should be ever zealous to protect from any but clearly just demands all trusts which for the time may be in their control and especially trusts like this, which are designed for the general promotion of human welfare. Courts have not always been as careful in this regard as they should have been, and on that account they have been subjected to criticism not undeserved. Very often in the opinions of the higher courts has this fact been noted. Thus, the Supreme Court of the United States in Trustees v. Greenough, 105 U. S. 527, 536, 26 L. Ed. 1157, said: "We would be very far from expressing our approval of such large allowances to trustees, receivers, and counsel as have sometimes been made, and which have justly excited severe criticism."

1. I do not find it necessary to pass upon the interesting and somewhat difficult ques-

tion as to whether the attorneys for the Attorney General are entitled to compensation from the trust fund here. I find from the evidence taken, and in that respect I agree with the committee of lawyers appointed by me, that these attorneys served in a dual capacity, as attorneys for the Attorney General and also as attorneys for the trustees and I find that they are entitled to precisely the same compensation for the services rendered in the latter capacity as they would have been if they were entitled to compensation out of the trust fund as attorneys for the Attorney General.

2. A number of things are to be considered in determining in any case and in this one what is a reasonable allowance for legal services. It is easy to set out what these things are, but having set them out it is not so easy to apply them. There should be considered undoubtedly inter alia the time devoted by attorneys to the case in connection with which allowances are asked, the difficulties of their task, the amount involved in the controversy, whether they have been successful, whether compensation was certain or contingent, whether they have been otherwise compensated than by the allowances they may receive, what compensation generally is allowed for services of similar character and quality. To these might be added many others, although upon analysis it doubtless would be found the others are but variations of those stated. It will not be found that there has been much discussion of any of these various elements. It is said that they should be considered, and not much more than that is said.

Certainly the time spent by an attorney in rendering legal services should be considered in determining what is a reasonable allowance for those services. In that connection, however, one must consider also what time was reasonably necessary for the services required. No one would say that a lawyer who by reasonable diligence could do all that ought to be done in one month's time should be paid twice as much because he has taken two months for the task. It is not suggested that such was the situation here, but certainly the principle should be clearly stated. To say that mere length of time devoted to a given task should determine compensation for that task without inquiry as to whether so much time was reasonably necessary would be to make possible very grave abuses. If at the usual rates of payments the average farm hand receives $5 for cultivating 3 acres of corn, it would be most unjust to pay a particular laborer, because he took two days to do what the average farm hand would do in one, $10 for the same service. The difficulty in a situation such as this one is to determine what time was reasonably necessary to do the work required. Consideration, therefore, of this first element, involves consideration of another element, namely, what was the task presented to attorneys by this case, and what difficulties did it offer.

The work to be done by attorneys in this case was not the less difficult because its general nature was from the beginning clearly indicated. The case was simple in the sense only that a single problem was presented. At least it was apparent from the start that principally, if not altogether, the question involved, and upon the answer to which the whole case turned, was a question of law. The task of the attorneys was to find the answer to that question, and that question was, Did the language used in the Harry Wilson Loose will create a valid charitable trust? Only slight examination of the bill filed by the plaintiffs and of the will itself clearly revealed that the principal question divided itself into two: First, did the language of the will permit the trustees to use the funds for other than charitable purposes? Second, if it did not, was the language used so vague and indefinite as to render the attempted creation of a charitable trust ineffectual. When it was shown, if that was possible, that these questions and each of them should under the law be answered in the affirmative, then attorneys had done all that it was possible to do to sustain the trust and their task was finished.

It was necessary first of all, as a preliminary, to determine in what law was to be found the answer to the questions presented by the case. That preliminary research presented no difficulties and required comparatively slight research. That the questions were to be answered from the law of Missouri was clearly indicated by uniform and unquestionably authoritative decisions of the Supreme Court of the United States. From the beginning and throughout the case there was never any controversy betwen the parties but that the law of Missouri was decisive of the questions which the case presented. The task then almost immediately was recognized as reduced to this, what is the Missouri law upon the subject of charitable trusts with reference to the two questions which must be

answered negatively if the case was to be decided in favor of the defendants.

No question of fact was involved in the case. There was in it none of that uncertainty nor of that consequent anxiety and concern which always are incident to controverted issues of fact and which proceed from the possibility of conflicting testimony and from the often well-grounded fear that testimony upon vital points cannot be obtained at all; that witnesses will not accurately recall the facts; that they may even be diverted from the truth. There was in the case none of that concern and anxiety which inevitably attend a jury trial about which always hover the specters of ignorance, prejudice, and human frailty. At that moment in any case when an attorney discovers that it involves only a pure question of law, he is raised from a state of worry to a seventh heaven. Then he knows that he has only to find the law that somewhere must be written and to apply to what has been written his powers of reasoning, and to state then as clearly and convincingly as may be what the law is. He cannot and does not wish to and may not hope to change the law. His task becomes the most pleasurable that a lawyer may undertake, and in the pleasure which such a task brings with it he feels no little compensation for all his toil.

With the many aids with which publishers and text-book writers have now provided the profession, encyclopedias, digests, treatises of various kinds, search for relevant decisions upon any question of law that may arise has been immensely simplified. Little time indeed is now required to find citations to every case which has been decided in English speaking countries upon any question except the most obscure. Undoubtedly the attorneys in this case availed themselves of these facilities. It took but little time to make a list of every decision of the Supreme Court of Missouri and the appellate Missouri courts which made the slightest reference to the general subject of charitable trusts. It took but little time to obtain reference to all other cases in any English speaking state or country dealing with that same subject. It was an easy matter to assemble all that had been written, and, having assembled it, to be assured that the most diligent adversary could find nothing else. All of that was done by the attorneys here, and done with that thoroughness and undoubtedly with that celerity which characterize the most highly

skilled. But, when all of that was done, the real task had only just begun.

Finding precedents is necessary but relatively unimportant work. Any one of hundreds of lawyers fresh from law schools would be very glad, for a most meager compensation, to compile a list of every case dealing with charitable trusts. He would not need a month's time to accomplish that, and he would look upon $500 as ample compensation for his work. The real work of the lawyer begins when the precedents have been found. Analysis of the decided cases, penetration of these cases to find the principles which underlie them, reasoning as to the right application of principles to facts, therein lies the real task of a lawyer, a task which demands for its best performance the highest powers of the human mind. Where one hundred can find the precedents, one may be discovered who can use them perfectly. There was only one Michelangelo, but there were thousands who could carry to him the chisels that he required or the brushes that he needed.

The attorneys in this case did everything that possibly could have been done, and did it with the greatest skill and by the use of the finest mental qualities. Not Webster nor Rufus Choate nor the present eminent Chief Justice of the United States, when at the bar, could have done more nor have done better what was done. It would be impossible to overpraise either their diligence or their accomplishment. If in their great zeal to do perfectly the task they had they did more than was necessary to be done, that is certainly commendable, although it may be doubted if the same compensation should be paid for work that was not altogether necessary as for that which certainly was necessary. One who digs a mine is rewarded greatly and should be while he works the principal vein of gold, but his work may not be quite so valuable if, having exhausted that, he pulverizes the whole mountain and subjects the mass to chemical treatment that he may find yet a few molecules of the precious metal, which, when they have been found, add but little to the whole recovery.

The questions involved in this case were to be decided by Missouri law. That law was embodied in not more than thirty decided cases. Those cases were sufficiently numerous to quite well evidence what was the Missouri law. The real task of the attorneys here was to present these decisions, to ana-

lyze them, to compare them, from them to develop underlying principles, and to apply those principles to the instrument involved in the case. If there was something to be gained from a study of the preceding law, from a study of the law of other jurisdictions, it was relatively insignificant, relatively unimportant. The research which was made outside of Missouri law was valuable, but not so valuable and therefore not deserving of compensation to the same extent as research in the field of Missouri law.

The time which was devoted to this case by attorneys Stinson, Mag, Wright, and Welch as shown by the evidence, and, of course, their testimony as to the time which they devoted to this work is accepted at its full face value, was as to the first two named nearly a year each, and as to the second two named perhaps more than six months each. It is difficult, however, for me to believe that any one of these four in a year's continuous application would not have done 90 per cent. of what was necessary to be done for a full and adequate investigation and presentation of the law as to the questions which the case presented. That may or may not be true. It is impossible to say with certainty that it is true, but, if it is true, then I think it follows that that should be considered in determining what is reasonable compensation. If in a given case each of four lawyers does for a client what one alone could have done, it certainly does not follow that the client should pay four times what would have been a reasonable fee for one lawyer.

3. But it is said in almost every case in which the question of allowances is for decision that the amount involved should be considered. Exactly why the amount involved should be considered is not entirely clear, nor has it often, if at all, been discussed. I think it is a matter deserving of some thought. It has been suggested that the amount involved should be considered because on account of the amount involved greater work necessarily will be done. Again it has been said that, because of the amount involved, the responsibility borne by an attorney is a greater one. It has been suggested also that, where a large amount is involved and where the outcome of the case is the preservation to the litigant of that large amount, the attorney should be more amply compensated upon the theory that he has saved for his client the large amount. Perhaps there is an element of truth in each of these suggested reasons for some relation between the amount involved and what is reasonable compensation.

It is true that more work will be done in a case involving a large amount than in a case involving a relatively small amount even though the questions involved in the two are precisely the same. The questions would have been the same in this case if the trust fund bequeathed had been $10,000 instead of several millions. If the case had involved but $10,000, attorneys would have felt called upon to devote to the case only a relatively short time, since they would have known that their compensation must be small. But there is a maximum of possible work to be done in a case which depends upon a question of law. More than that amount of work cannot be done no matter what amount may be involved. If the work were to be graphically represented, it would be found that the curve would rise as the amount involved increased to a certain point and then would rise no further. Thus, if the trust fund here was $500,-000 it would still have been an amount so large as to have called for the maximum of possible effort. From the standpoint of the work involved, it does not seem to me that any more work was called for or would have been done in a case involving $4,000,000 than in a case involving $500,000.

While there may be an element of truth in the suggestion that the responsibility of a lawyer increases with the amount involved, I think that is somewhat doubtful if the word "responsibility" is given its ordinary and usual meaning. The lawyer is not responsible for the outcome of the case. His responsibility is measured by his duty, and his duty in a case in which a question of law only is involved is to fully and clearly present the law which supports his contention. When he has done that, he has done all that he has any right to do and all that honorably he can do. Certainly his duty does not differ in quality as the amount involved in a case increases. Perhaps his anxiety will increase with the amount involved and perhaps that increased anxiety will make more difficult the work he does, but here also the rising curve of possible anxiety soon reaches its highest point, and after that an increase in the amount involved does not bring with it a corresponding increase in the burden carried. It is very much to be doubted if the anxiety a lawyer feels (call it responsibility if you will) is greater in a case involving $4,000,000 than in a case involving $500,000.

The theory that an attorney who renders services in a case in which a trust fund is involved has "saved" that fund and should be compensated therefor in proportion to the amount involved is scarcely tenable. That theory proceeds upon the unwarranted assumption that what has been saved would have been destroyed except for the efforts of the attorney, whereas it is the law which saves that which should be saved and destroys that which ought to be destroyed. Neither the attorneys nor the judges save anything. The service which both attorneys and judges render is to secure justice under and according to the law. The attorney renders great services, never to be minimized in value, but those services should not be valued upon any untenable theory. Certainly not upon that theory which gives to the man who rescues a sinking ship at sea in compensation for his services a percentage of the value of the ship. The ministers of the law are not to be compared with the unreasoning elements. While in this case the labor of the court was immensely lightened by the invaluable research and clarifying written and oral arguments of attorneys, it is scarcely conceivable but that the same result would have been reached and the trust created by Harry Wilson Loose sustained even if that trust had gone wholly undefended. And it is not conceivable that it would have gone wholly undefended even if the trustees had refused to employ counsel and if the Attorney General had neglected his bounden duty.

4. In addition to the various elements which I have mentioned as proper to be taken into consideration in making allowances in this case, there should be also considered the fact that services rendered by attorneys here were really services rendered to the general public. It is the general public and not private individuals who will benefit from this trust. Public service generally receives and should receive a smaller measure of pecuniary compensation than that which is rendered to private persons. Perhaps the reason for this distinction is to be found in the compensation other than pecuniary which those who serve the public well are supposed to and perhaps do receive. That other compensation is made up of three elements: First, the satisfaction of having served the public, in this case the satisfaction of having contributed to the happiness and welfare of the unfortunate classes whom this trust will most benefit. Those who have contributed to the preservation of this trust have something at least of the same high reward that the tes-

tator thought was worth to him the several million dollars which he gave. The second of the elements involved in this "other consideration" of which I speak is the public recognition accorded and the honor given to one who has rendered a conspicuous public service. And the third of these elements is the certainty that a great public service of a professional nature, calling for a high order of legal ability and attended by successful results, inevitably enhances the standing in the community of him who gives it and ultimately brings to him in other matters substantial financial gain. Lawyers generally have regarded these forms of nonpecuniary compensation as of great value.

Lawyers have dominated legislative bodies and have controlled their action and through them have fixed the pecuniary compensation of judges and of attorneys for the nation and states at what justly would be regarded as inadequate for similar services rendered to private litigants. It may well be said that it is the will of the bar that the Attorney General of the United States shall receive an annual salary of $15,000, that the Solicitor General shall receive an annual salary of $10,000, that the Attorney General of Missouri shall receive for his services as Attorney General an annual salary of $3,000. These officials are only temporarily employed at the salaries which have been fixed. When their brief terms of office have expired they must each return to private life and build up again a business from its scattered remnants. While for the short time of their service their salaries may be certain, nothing is more certain than that soon their public employment will be ended. Yet while they are in office the litigation which each of them handles is incomparably greater in the amounts involved and in the difficulties presented than was this one case. What the bar has said is fair and reasonable pecuniary compensation for them may be given some consideration in determining what is reasonable compensation for services of a similar character which also are rewarded by the same nonpecuniary compensation. It is doubtful if any attorney participating in this case, however much the case may have disrupted his other business, sustained any such disruption in his other business as is sustained by any attorney serving the public in an official capacity. The Supreme Court of the United States has very strongly intimated that, in fixing compensation at least for masters, rendering what may be spoken of as public services, the salaries of public offi-

cials should not be overlooked. Newton v. Consolidated Gas Co., 259 U. S. 101, 42 S. Ct. 438, 66 L. Ed. 844.

2. After all, back of all of the things which it is said should be taken into consideration in determining what is reasonable compensation for legal services lies the economic law of supply and demand. That law fixes what should be paid for a bushel of wheat and a loaf of bread. That law determines what is reasonable compensation for the plumber, the carpenter, the blacksmith. It determines what is reasonable compensation for the surgeon and the lawyer. In the higher professions it is more difficult to apply that law than it is in the trades and in fixing prices of commodities, but still it is that law which at last governs and should govern in the matter. If services equally good could be had from any one of a dozen lawyers in a given case for a fee of, let us say, $10,000, it would be unreasonable to pay a lawyer who was arbitrarily selected twice as much. If there were a dozen lawyers at the bar of Kansas City of ability equal to that high order of ability possessed by the attorneys who participated in this case who would have contracted in advance to defend the trust involved here for $25,000, then a fee of much more than that cannot be said to be a reasonable fee. If wheat is selling at $1 a bushel, $2 a bushel is not a reasonable price. I do not agree that it would have been impossible for the trustees in this case to have secured the services of the very ablest members of the bar in the defense of this trust upon a contract that, if the trust was upheld and if the court approved, they should be paid a maximum fee of $25,000. That was not done, and perhaps it would have been unprecedented if it had been done, but that it might have been done should be considered when the question of reasonable compensation is for decision.

It seems to me that it was very wise on the part of the trustees that the firm of Ryland, Stinson, Mag & Thomson should have been selected to defend this trust. One of the trustees was a member of that firm, and himself did a great part of the work for which compensation now is rightly asked. It was this trustee who had drawn the will in question, who had written the language creating the charitable trust, and that he had done, not in his individual capacity, but as a member of his law firm. In other words, it was this law firm which wrote this will and which was responsible for the language used in it. The trustees may well have thought that on

that account this firm was the one firm which should be selected to defend this trust, not only on account of the outstanding ability of its members, but because it would receive in a peculiar sense compensation for its services. If this great trust should ultimately be held to be invalid, if the $4,000,000 constituting the fund should be lost to public charity and be handed over to the collateral kindred of the testator, that would not be because the testator did not earnestly desire that the fund should be used in public charity. That would not be because the will could not have been so written as to avoid so unfortunate a result. That would have been because a great blunder had been committed. No blunder was committed. The will was drawn with extraordinary skill and foresight. But the firm of Ryland, Stinson, Mag & Thomson had an immense interest in having the will upheld. The reputation of the firm was at stake. The trustees knew that fact and knew that, in the preservation and enhancement of that reputation, this firm would receive a compensation which no other firm of lawyers, had it been retained, would have received. I do not think that this additional compensation which was received by this firm can be entirely overlooked in determining what is a reasonable pecuniary compensation for it. While what has been done by this firm has contributed greatly to the favorable result which was reached in the case, it has in a very special sense contributed to the firm's prestige and standing.

Still another matter is to be considered in connection with this firm in the matter of compensation for its services in this case. Before now it has received compensation from this fund for other legal services. It appears that that compensation has been only fair and just and indeed modest in amount. There is every reason to believe that in future litigation involving this trust, if there should be such future litigation, and it would be strange if there were not, this same firm will continue to represent the trustees. This firm then was serving the trustees and the trust in this case, not as in a single matter, but in one of a series of matters that have arisen and will arise. In such a situation a firm is, in any given service, compensated in part by the total compensation which over a course of years it will receive from the same client.

6. Notwithstanding all that I have so far said, I do not overlook the fact that in many cases, both in Missouri and elsewhere, fees have been allowed very much greater than

the allowance which is recommended by the committee I appointed, and perhaps in no case where the amount involved was as large as here has a fee as small as that recommended been paid. I have no doubt that the attorneys asking allowances here were greatly influenced by these precedents in determining how much time they would devote to this case. The fact that the allowances which in some cases have been made have been so large as that on account of them courts generally have been severely criticised, did not perhaps enter into their consideration. They did the work with the standards of compensation to which so many precedents pointed in contemplation, and, on that account, after the work is done, other standards of compensation, although more reasonable, should not be given their full effect. Therefore I have come to the conclusion that the allowance recommended by the committee of attorneys selected in this case should be moderately increased.

■ Two of the attorneys for the Attorney General, Messrs, Wright and Welch, have indicated in their testimony that they regard a total of $26,250 as reasonable for them. I think it is not greatly more than under all of the circumstances they are entitled to receive, and I have decided to make an allowance to each of these gentlemen of $10,000.

The attorneys for the Attorney General and the attorneys for the trustees are best qualified to say what was the relative value of their services in this case and they have unanimously agreed that of the total compensation to be awarded the attorneys for the trustees should receive 62½ per cent. and the attorneys for the Attorney General should receive 37½ per cent. Substantially but not exactly following that recommendation, and taking into consideration what I have said as to the additional compensation received by the firm of Ryland, Stinson, Mag & Thomson, I think that firm should receive an allowance of $34,000.

The Attorney General selected four attorneys to represent him in this matter. In addition to Messrs. Wright and Welch, he selected Messrs. Woodbury and Meyer, lawyers of ability and of high standing at the bar. There was not the slightest necessity that four attorneys should be employed by the Attorney General to assist the attorneys for the trustees in this case, especially in view of the fact that the attorneys for the trustees were several in number, of outstanding ability, and having every reason to devote full time and effort to this case. To make allowances to attorneys of whatever ability who did not as a matter of fact do more than a very small amount of work in the case would certainly be to justify public criticism of the court. It appears from the testimony taken in this case that the attorneys for the Attorney General other than Messrs. Welch and Wright did very little. Their names did not even appear upon the briefs filed in the case, nor did they participate in the oral argument. I cannot make more than a small allowance to each of them. I think that $500 is fair and reasonable. If they are entitled to greater compensation, it can be given by the state.

■ 7. Before the filing of the bill in this case, the trustees, acting under the authority vested in them by the will, made allotments to nineteen charitable institutions in Kansas City in a total amount of $67,000, of which $24,399.89 had been paid. After the bill was filed, no further payments were made. Of the nineteen institutions, three, the Women's Christian Association of Kansas City, Mo., the Children's Mercy Hospital of Kansas City, Mo., and the George H. Nettleton Home for Aged Women of Kansas City, Mo., had been particularly recommended to the favorable consideration of the trustees by the testator in his will, although it was expressly provided by him that that recommendation was not binding on them. It seems clear to me that none of these institutions was a necessary party in this case. Nevertheless, ten of them sought permission to and were permitted to intervene and did file answers as intervening defendants in the case. Various attorneys represented these institutions, but with one exception none of them participated actively in the defense nor contributed in any way so far as I am aware or the record shows to the result. The mere fact that appearances were made for the several institutions by so many distinguished members of the bar may be thought to have had some psychological effect and perhaps to have given "atmosphere" to the cause of the defendants. If that was the purpose of drawing into the case so many learned counselors, I must protest that I am unconscious of having been influenced by it. I am grateful, however, that the same purpose, if it at all existed, did not prompt the bringing into open court of the aged women from the George H. Nettleton Home and the crippled children from Mercy Hospital.

That each of the small army of lawyers which represented these various charitable institutions is entitled to compensation from

the trust fund for the services rendered is a contention which has not been urged and could not be supported by law or reason if it were urged. For such small services as were rendered by these attorneys they may rightfully look for compensation to the institutions which they represented. It may be that some of them did more than merely petitioning for leave to intervene and filing answers, and that those should receive from their principals more than the very nominal compensation to which the majority would be entitled. If such there were, I hope they will be satisfactorily compensated by those they served.

The firm of McCune, Caldwell & Downing represented the Women's Christian Association, which, of the three institutions specifically recommended in the will to the favorable consideration of the trustees, was perhaps most strongly recommended. To that association in their first allotment the trustees gave the largest single amount, obviously in recognition of what they understood to be the wish of the testator. That association can reasonably expect that throughout the future life of this trust it will receive especially favorable consideration, and that in all probability it will in the course of years profit from the trust in a very large amount. It was justified, therefore, in employing counsel to assist in the defense of the trust and in expecting from them more than merely nominal services, and counsel rendering such services certainly would be justified in charging the Women's Christian Association for the services which they rendered.

Alone of all the attorneys representing the so-called intervening defendants, the firm of McCune, Caldwell & Downing, through Mr. Blatchford Downing of that firm, did render real services in the litigation. Those services were of an exceptionally high order. Mr. Downing gave much time and careful thought to the case from shortly after its inception until the decree was entered. He participated to no small extent in the preparation of the briefs which were filed. He made an oral argument that materially added to the presentation of the issues. It appears from the evidence which was taken that he did his best to keep within a reasonable compass both the written and oral arguments in the case, and on that account alone he is entitled at least to the court's gratitude. Why this one firm of lawyers should have done so much more than was done by other attorneys representing the intervening defendants can-

not well be explained except upon the theory that they understood they were in a sense at least associate counsel for the trustees. Members of the firm have testified that that was their understanding and that that is the explanation of the large amount of work which was done by them. But it is clear from the record that the trustees themselves had no such understanding as to the employment of this firm.

While I am very clear in the view that attorneys who rendered no services should not receive any compensation in this case merely because of some nominal connection with it or because they stood by and were ready to serve if their services were required, it seems to me it would be quite inequitable that, where real services were rendered, they should receive no compensation. I think that a reasonable fee to the firm of McCune, Caldwell & Downing for its services would be not less than $5,000. It is my view that for that compensation this firm should look principally to its client, the Women's Christian Association, but that there is sufficient testimony in the case, sufficiently corroborated by the circumstances within my observation, to warrant the conclusion that in the same sense as the attorneys for the Attorney General, this firm was brought into the case by and in part at least represented the trustees. I think they should receive from the trust fund $2,000. If my view as to their right to any compensation from that fund is not regarded by the trustees as warranted, they may take that matter into consideration in future apportionments from the income of the trust.

I regret that I do not feel that other allowances to attorneys rightfully may be made.

8. It is understood, of course, that the allowances now made are for services thus far rendered. One of the trustees, Mr. Swinney, and perhaps he spoke also for another of the three trustees, to wit, the First National Bank, in his testimony before the committee, urged that the allowances now made be not only for services already rendered, but for those that hereafter may be rendered in this case. Undoubtedly he had particularly in mind the services to be rendered in the Court of Appeals when and if the judgment in the District Court is appealed to that court as now appears to be a certainty. The allowances now made, however, are intended only to compensate attorneys for the work they have done in this court.

What work will be required in the Court of Appeals remains to be seen. Obviously

much less work will be required in that court than here. Very little further by way of research into the law will be necessary. It may well be said that the whole field of the law has been exhausted by the research already made, the results of which have been put into a readily available form. All that remains to be done is to recast the briefs which have been written and to prepare and present to the Court of Appeals an oral argument. The results of the research and reasoning done in the trial court and for which, when the allowances herein have been paid, nearly $60,000 will have been expended, certainly should be considered when remuneration is given for the preparation of the brief in the appellate court and the oral argument in that court.

It may have been impracticable at the inception of this case to have contracted with attorneys for services to be rendered, although I am not so sure that that would have been impossible. The difficulty then was to foresee with any reasonable certainty what work actually would be required. But that is not now the situation. Now what must be done may reasonably be anticipated. Now, at least, the trustees are in a position to, and I think should, obtain an agreement in advance from such attorneys as they select to represent them in the Court of Appeals as to a maximum fee to be paid for the services there to be rendered, subject to the approval of the court.

### Order.

Pursuant to the conclusions announced in the foregoing memorandum, it is ordered that the amounts hereinafter indicated be paid by the trustees from the trust fund to the following named parties:

To Ryland, Stinson, Mag & Thomson, as compensation for their services as attorneys in this case, the sum of $34,000.

To Leslie A. Welch, as compensation for his services as attorney in this case, the sum of $10,000.

To Leslie A. Welch, on account of expenses incurred by him, the sum of $233.31.

To John S. Wright, as compensation for his services as attorney in this case, the sum of $10,000.

To John S. Wright, on account of expenses incurred by him, the sum of $632.29.

To Everett R. Meyer, as compensation for his services as attorney in this case, the sum of $500.

To Charles B. Woodbury, as compensation for his services as attorney in the case, the sum of $500.

To McCune, Caldwell & Downing, as compensation for their services as attorneys in this case, the sum of $2,000.