[Civ. No. 12607. First Dist., Div. Two. Sept. 13, 1944.]

J. R. BEARWALD et al., Respondents, v. FRANK C. MOR-
TIMER, as Building and Loan Commissioner, etc., Ap-
pellant.

Robert W. Kenny, Attorney General, and Clarence A. Linn, Deputy Attorney General, for Appellant.

J. H. Sapiro and Edwin V. McKenzie for Respondents.

SPENCE, J.—Defendant appeals from a judgment awarding plaintiffs $200,000 as compensation for services rendered by plaintiffs and their employees as accountants and tax experts in connection with the affairs of the Pacific States Savings and Loan Company, a corporation, hereinafter called the association.

The services of plaintiffs and their employees extended over a period of approximately four and one-half years, commencing in the early part of 1938 and ending in the latter part of 1942. The enormity and complexity of the task undertaken, the amount and quality of the work, and the very gratifying results obtained by plaintiffs were all conceded.

The parties were unable, however, to agree upon the amount of compensation to which plaintiffs were entitled and plaintiffs therefore brought this action.

Before considering the facts and defendant's contentions on this appeal, it may be stated preliminarily that the positions taken by defendant and his predecessors in the office of Building and Loan Commissioner have not been entirely consistent with respect to plaintiffs' claim. There have been changes in that office and changes in counsel representing that office during the time that plaintiffs performed their services and during the course of this controversy. We will discuss defendant's contentions as they appear in the briefs on appeal referring in some instances to the shifts in the positions taken.

The main contention on this appeal is that the amount awarded is excessive. There are other contentions which will be hereinafter discussed but the consideration of this main contention requires a summary of the evidence concerning the agreement under which plaintiffs' services were performed, the nature and extent of the services, the results accomplished and also a summary of the expert evidence regarding the value of said services.

The original agreement for plaintiffs' services was made in January, 1938, between plaintiffs and the association. It was evidenced by letters exchanged between the parties and it was thereby agreed that the association would pay plaintiffs a "reasonable fee" for their services to be performed in connection with the association's federal income tax matters for the years 1934 and 1935. These letters show that such "reasonable fee" was to be calculated not "on a per diem basis, nor upon a fee wholly contingent on results" but was to be calculated by taking into consideration "the amount of work, sum of money involved, plaintiffs' knowledge of their profession, results obtained and other circumstances."

Plaintiffs started upon their work of compiling information and of studying the problems connected with the federal income tax matters for the years 1934 and 1935 and were still engaged in that work when, on March 4, 1939, Ralph Evans, the then Building and Loan Commissioner, took possession of the association. Since that date, the affairs of said association have been administered by said Ralph Evans and

his successors in office. Shortly after the take-over and on April 27, 1939, plaintiffs proposed to the commissioner that they continue their employment "upon the same basis as evidenced by letters exchanged" between plaintiffs and the association. On May 8, 1939, the commissioner agreed to that proposal with respect to the income tax matters for 1934 and 1935, but asked plaintiffs to hold in abeyance a proposal to proceed with the income tax matters for 1936 and 1937, which matters had not been included in the original agreement between plaintiffs and the association. On May 10, 1939, the commissioner executed certain "forms of power of attorney" at the request of plaintiffs and he further evidenced by letter his ratification and adoption of the original agreement by reciting generally the terms of the employment and stating that the agreement "has not been terminated or in any way altered by me and in executing the power of attorney form I am not making any new or different contract but simply making it possible for you to continue under your former employment and complete that agreement referred to." In July, 1940, the commissioner was advised that a jeopardy assessment would be levied on income taxes for the years 1936, 1937, 1938. It was then agreed between plaintiffs and the commissioner that plaintiffs would handle this matter and that the compensation would be "a reasonable fee based upon the extent of the services necessary to conclude the matter."

Proceeding to a consideration of the nature and extent of plaintiffs' services, we find it difficult to give any adequate description thereof without unduly prolonging this discussion. We believe it will suffice to set forth certain facts which will give some indication of the complexity of the problems presented and some indication of the necessary time and skill required in solving those problems and in effecting the final settlement in June, 1942, of all federal tax matters and the final settlement thereafter of all state tax matters. These facts, when considered with the expert testimony and certain concessions of defendant's counsel in the trial court and in the briefs, should be adequate for our purposes.

The association had been built up into a concern claiming assets of over $100,000,000. Its average annual gross income had been approximately $15,000,000 and the income involved in the tax questions exceeded $17,000,000. The handling of

the association's accounting system had been complicated by the fact that in 1931 the association had taken over, under an unusual type of agreement, the Fidelity Savings and Loan Association and had similarly taken over at about the same time the United States Building and Loan Association. There had been conflicting court decisions as to whether the agreement with Fidelity constituted a sale to the association or a trust. Foreclosures had been numerous during the so-called depression era and approximately 8,000 separate parcels of real property had been acquired as the result of such foreclosures. Under a policy pursued by the association of acquiring large property holdings to replace the numerous small property holdings previously acquired on foreclosure, the number of separate properties owned had been reduced to about five hundred. These transactions had been handled largely through subsidiary corporations and the question of whether such transactions constituted exchanges or constituted sales and purchases still remains in dispute.

The association had apparently pursued no consistent policy with respect to its accounting system unless perhaps it was the policy of making the most favorable showing for certain purposes with respect to income and solvency. To this end, as we understand the record, the books of the association had been kept partly on a cash basis and partly on an accrual basis. Property acquired on foreclosure had been entered on the books at a value equal to the prior loan together with interest and taxes due at the time of the foreclosure and all costs of foreclosure, and without regard to the value of the property at the time of foreclosure. After setting up such values on the books, no depreciation had been taken for the tax years in dispute upon any of these properties acquired on foreclosure. The Fidelity agreement had been treated as one creating a trust and a management fee had been taken by the association and had been treated as income on the books but not in the federal and state returns. There were other complications in accounting brought about by the manner of handling, on the books of the association, the claims of certificate holders of the Fidelity Building and Loan Association and of the United States Building and Loan Association. Again complications arose from the purchase by the association of certificates of its own certificate holders

at less than the face value thereof. Further complications arose from the system of accounting used with respect to losses on sales of property which had been previously acquired on foreclosure. The foregoing merely hints at some of the main difficulties which confronted plaintiffs when they assumed their task of solving the tax problems involved. The The books of the association did not reflect the true status of the association with respect to income or solvency and said books could not be reconciled with the returns made to the federal or state government and neither the books nor the returns could be reconciled with the statements of condition which had been issued for publication. Defendant concedes in the briefs that ''The books as set up showed a tremendous income''; that it was necessary that the books be ''reconstructed''; that ''much 'pick and shovel' work was required in the reconstruction of the books''; and that ''the problems involved . . . were not without difficulty.'' A reading of the records shows that these concessions are in line with those made by other counsel for the commissioner in the trial court but these concessions give no true picture of the real complexities or of the vast amount of work and skill required.

After a study had been made of the books and the problems thereby presented, and after numerous conferences had been held with representatives of the federal government, it was determined by plaintiffs that the books of the association had to be entirely reconstructed, not alone for the tax years in dispute but for all years commencing with the year 1931 in order to establish a base from which the income for each succeeding year might be computed. The new books were set up by plaintiffs as though the old books were nonexistent except for the fact that comparisons of the hundreds of thousands of entries had to be carried in parallel columns in order to explain and justify the changed entries. This could not be done by applying a formula to the original entries but involved a detailed study and investigation of each of innumerable transactions, including the transactions relating to the 8,000 separate parcels of real property hereinabove mentioned.

The services performed by plaintiffs were more than the services ordinarily performed by accountants. The proper performance of the services required the highest type of skill of plaintiffs as tax experts in solving the complications and

in acting as advocates before the various persons and agencies representing the federal government in the handling of tax matters. We shall not detail the necessary proceedings taken and the divided opinions encountered by plaintiffs within these agencies in the course of the performance of their services. We will merely state that despite all difficulties encountered, plaintiffs ultimately succeeded in bringing their efforts to a successful conclusion in 1942 with the results hereinafter mentioned. It was conceded upon the trial that plaintiffs' services ''were very valuable and that the plaintiffs in this case did a fine job''; and also that the ''actual out-of-pocket expenses'' of plaintiffs in the performance of the work amounted to $36,000.

The evidence was uncontradicted concerning the actual working time involved during the period of more than four years over which the services extended. Expressed in the equivalent of working days of seven hours each, the number of days actually spent in the performance of the work was as follows:

| | | |
|---|---|---|
| Plaintiff J. R. Bearwald | 315 | days |
| Plaintiff W. J. Renz | 330 | days |
| Senior Accountants | 948 | days |
| Junior Accountants | 2138 | days |

Turning to the results accomplished, we find that the total sum claimed for additional taxes and interest was $5,416,139.80. In the final settlement which was effected by plaintiffs, the total payment for additional taxes and interest was $530,070.02. In other words, there was a saving of almost $5,000,000 by the final settlement which plaintiffs succeeded in making. On this appeal, this saving is referred to in the briefs of defendant as ''mythical'' but we cannot find any justification for the use of that term. In any event, the question of the results accomplished through the efforts of plaintiffs is settled by the admissions of the pleadings and the findings of the trial court. Plaintiffs alleged in their complaint that ''Through the efforts of plaintiffs the matters were settled and . . . the Federal and State adjusted tax and interest was fixed at $530,070.02, and the original Federal and State of California deficiency tax and interest claim amounted to $5,416,139.80, a total saving in Federal and State taxes of $4,888,069.78, solely through the efforts of these claimants.''

These allegations were not denied and the trial court made findings in accordance with said allegations. While defendant is precluded on this appeal from thus shifting from the position reflected by the pleadings, we may state that the findings with respect to the results accomplished are clearly supported by the evidence as well as by the admissions of the pleadings.

A review of the expert evidence introduced shows that the award of $200,000 finds full support in that evidence. Four experts were called, three by plaintiffs and one by defendant. While the testimony of these experts as to the reasonable value of the services varied, Mr. Treadwell, Mr. Sherwood and Mr. Dooling, who were called by plaintiffs, testified to amounts in excess of the amount awarded. These estimates as to the reasonable value of the services were given in response to hypothetical questions and the witnesses were examined and cross-examined at length. We deem it unnecessary to dwell upon the testimony of plaintiffs' experts which justifies the conclusion that the award made was entirely reasonable. It appears appropriate however to make some reference to the testimony of defendant's expert.

Mr. Janin, who was called by defendant, testified on direct examination to a reasonable value of $100,000. The interesting point with respect to the testimony of this witness is that when his testimony is read as a whole, it apparently fully supports the award made.

Mr. Janin had been admitted to practice before the Treasury Department and Board of Tax Appeals for many years and was a "specialist in taxation with major emphasis on litigated problems." He testified that he had read only one case in which the sum at issue was greater than that in the present case and that he had heard of a case but had never read a case in the published opinions where the tax issues were "as complex as this one." He further testified, "There is no question at all but what Bearwald and Renz were called upon to exercise expert tax judgment in the handling of these controversies. . . . There are five or six important tax points involved in the case on which real expert knowledge and experience were required." He also testified that he had never heard of a single case, where as here, the case had gone from the Technical Staff to the Board of Review with a minority report and that this indicated a close case. And he

further testified that he did not know of a decided case in which the award for services was less than 10 per cent of the "results obtained" where that factor was either the sole or one of several elements of value.

While testifying on direct examination to $100,000 as the reasonable value of the services, Mr. Janin admitted that he could give no formula or precise basis for his estimate but that "it is just the amount that strikes my mind . . . as reasonable." He claimed that he was aware of the standards of reasonable value as reflected in decisions but he conceded that he "paid very little attention" to such decisions. With reference to the saving of nearly $5,000,000 through the efforts of plaintiffs, he conceded that he had given "very little weight to that figure."

During the cross-examination, three schedules of fees, purporting to be schedules of the usual, customary and standard fees for accountants in San Francisco, were shown to Mr. Janin. These schedules differed in some details with respect to the amounts specified in each for the per diem rate for partners, senior accountants and junior accountants but said schedules were not dissimilar. These schedules purported to be schedules solely for expert accounting work. When applied to the days spent on the work done by plaintiffs and their employees, the schedules indicated the reasonable value of the accounting work at varying sums, the lowest schedule indicating a reasonable fee in excess of $150,000 and the highest schedule indicating a reasonable fee of slightly less than $200,000. Mr. Janin recognized that there is a "range of honest discretion in fixing accounting fees." He stated as to the first and lowest schedule that "On a per diem basis that schedule is a reasonable amount as measured by the standard in this locality for high class auditing work" and thereafter he conceded that "under my previous testimony, if the accounting work in days, was done, $165,000, is within the range of reasonableness for the accounting." He further conceded that the second and next higher schedule was within the discretionary range of reasonableness and, although some accountants had expressed the view that the rate for partners in that schedule was a "little high . . . it is within the realm of standard fees in this community." Using that schedule as a base, he conceded that $176,000 was "within the range of reasonableness" for the services performed. He testified

with respect to the third and highest schedule that it was "well within the upper limits of discretionary range" but that "it was the absolute peak of reasonableness." Using this schedule as a base, the reasonable fee for the accounting work would have amounted to $197,000.

There were further phases of the cross-examination of Mr. Janin which were significant. As we understand his testimony, the fee schedules contemplate accounting work only and a substantially larger fee than that indicated by the schedules would be reasonable where advocacy on tax problems before governmental officers and agencies is involved. But even more significant was his testimony regarding the effect of the results accomplished upon the amount which would be reasonable in a given case. He was asked to assume a case in which a given amount of work resulted in a saving of $1,000,000 and to assume another case in which the same amount of work resulted in a saving of $5,000,000. He was then asked in substance whether a larger fee would not be reasonable in the second case solely because of the greater result accomplished. He gave his opinion "that a fee in a case where the larger saving was made, all other circumstances being equal, might reasonably be, say, fifty percent greater than the reasonable fee in the other case."

We therefore conclude that in view of the admitted saving of almost $5,000,000, the testimony of defendant's own expert fully supported the finding of the reasonableness of the fee awarded. In passing, it may be stated that Mr. Janin's testimony on direct examination in which he estimated the value of plaintiffs' services at only $100,000 is possibly explained by his assumption on direct examination that certain possible savings had been overlooked by plaintiffs. He therefore apparently did not feel that the quality of the services had been of the highest and he apparently had not given much weight to the admitted saving of nearly $5,000,000 as he believed that a greater saving could have been made. On cross-examination, however, it was shown that Mr. Janin's assumptions with respect to such possible savings had been erroneous. Mr. Janin expressed his apologies for one erroneous assumption and as to another he stated "possibly I was mistaken because I had not had a great deal of time to go into the full accounts of the Pacific States case. . . ." We find nothing in the record to justify a claim that plaintiffs did not

use the highest degree of care and skill in performing the services or to justify a claim that plaintiffs overlooked or failed to urge successfully a claim for any possible saving.

Defendant has cited a number of bankruptcy and reorganization cases to support the proposition that fees awarded for services performed in connection with a corporation in liquidation are not to be measured by precisely the same standards as those awarded for services performed for a solvent corporation. This general proposition may be conceded but we cannot say that the fee awarded here was unreasonable or excessive when judged by the standards laid down in the great majority of the cases cited by defendant, which cases state that consideration should be given to the amount involved, the nature and extent of the services performed and the results obtained. (*In re Mountain States Power Co.*, 118 F.2d 405; *In re New York Investors*, 79 F.2d 182; *Irwin* v. *Swinney*, 45 F.2d 890; *McMannomy* v. *Chicago, D. & V. R. Co.*, 167 Ill. 497 [47 N.E. 712].)

It is difficult to state the remaining contentions of defendant. These contentions have been variously expressed in the briefs and in the oral argument. Some of these contentions appear inconsistent with each other and also appear inconsistent with the positions taken by defendant's predecessors and the positions taken by counsel for defendant in the trial court. In fact, we are not certain that we understand the final position taken by defendant on some of the points involved.

In the opening brief, defendant states his remaining contention or contentions under the heading "In pressing a claim against a building and loan association taken over by the commissioner or in the process of liquidation the statute must be followed—a claim must be filed, the commissioner must fix the compensation, and if the claimant is dissatisfied, he must seek relief from the judge supervising the liquidation." Thus in one sentence, defendant appears to take the inconsistent positions, first, that plaintiffs' claim was a claim against the association rather than against the commissioner and that plaintiffs' entire claim was therefore barred because no formal claim was filed by plaintiffs within the term prescribed for the filing of claims of creditors of the association (Building and Loan Association Act, § 13.16 (Stats. 1931,

p. 483; Deering's Gen. Laws, Act 986),) and second, that plaintiffs' claim was a claim against the commissioner rather than against the association and that plaintiffs were therefore entitled only to the compensation, if any, which had been *fixed* by the commissioner (Building and Loan Association Act, § 13.16) or in any event, only to such relief as might be obtained from "the judge supervising the liquidation." In that brief, defendant apparently urged that the filing of a formal claim was a prerequisite to any relief under any view of the nature of the claim and also urged that the agreement to compensate plaintiffs was invalid because the commissioner did not "fix" plaintiffs' compensation in advance and because the agreement for compensation was not under seal. In the closing brief, defendant seems to adhere to the view that the filing of a formal claim was a prerequisite to any relief but with respect to the fixing of the fee, defendant seems to take the position that his predecessor did "fix" the fee at $60,000 after the services had been performed and, having fixed the fee, the commissioner's determination could not be disturbed by the court except upon the showing that the action of the commissioner in fixing the fee had been arbitrary, unjust or inequitable.

We are uncertain regarding the final position of defendant on the question of the necessity of the presentation of a claim as reflected by statements made at the time of oral argument. At that time, plaintiffs had interposed a motion for leave to take additional evidence to show that a formal claim had been filed. Defendant opposed that motion. Plaintiffs had taken the position at all times that the filing of a formal claim was unnecessary but they stated that they had filed a claim merely as a precautionary measure. The copy of the claim, which accompanied plaintiffs' notice of motion, shows that it was filed as a claim "against the Building and Loan Commissioner of the State of California in charge of the property, business and assets of Pacific States Building and Loan Company, in liquidation." A letter was sent to the commissioner by counsel for plaintiffs advising the commissioner that "this claim is filed for services rendered to you and your predecessor Ralph W. Evans, for services rendered to him and you as Building and Loan Commissioner and as expenses of liquidation of said Association and not as a creditor or investor of said Association." It

therefore appears that the only claim which plaintiffs alleged that they had filed was a claim which had not been filed by them as creditors of the association but was a claim which had been filed by them as a claim against the commissioner. Defendant apparently conceded on oral argument, contrary to the position taken in the opening brief, that there was no provision requiring the filing of such claim. We have found no such provision and therefore believe that plaintiffs' motion to take additional evidence should be denied. The additional evidence which plaintiffs seek to introduce would be immaterial in the light of the views expressed herein.

Certain further facts should be stated. After plaintiffs had presented to the commissioner a bill or claim for $200,000 for their services, the commissioner refused to pay the same and in a letter to plaintiffs stated, ''You are further advised that in my opinion the amount of your claim is excessive and that a reasonable sum to be allowed for the entire services would be not to exceed $60,000. Since of this sum 31.25% was earned prior to March 4, 1939, only 68.75% of the $60,000 or $41,250.00 can be and is hereby allowed as reasonable and necessary compensation and expense for tax consultant employed by and payable by the commissioner under the provisions of Sec. 13.16 of the Building and Loan Act. . . .'' In other words, the commissioner calculated by some undisclosed method that a certain percentage of plaintiffs' services had been performed before the commissioner took over and he therefore claimed that such percentage of the entire fee was barred by the failure of plaintiffs to file a claim as creditors of the association. Such was the position taken by the commissioner in his answer to plaintiffs' complaint in which the commissioner offered to pay $41,250 into court for the benefit of plaintiffs and prayed that no judgment in excess of that amount be entered in favor of plaintiffs. On the trial, counsel for defendant, after speaking very highly of plaintiffs' ability and integrity as well as of the fine work done by them, stated ''we can't agree on the amount, . . . I have offered Mr. Bearwald, within the past few days, $100,000.'' It thus appears from a perusal of the answer of defendant and other portions of the record that the real controversy between the parties involved only the amount to which plaintiffs were entitled, and that the solu-

tion of that controversy was dependent in some degree upon the determination of the legal question of whether plaintiffs were barred by law from recovering for such portion of their services as had been performed before the take-over. On this legal question, the commissioner applied his version of the law thereby reducing plaintiffs' claim and, in his closing brief, defendant states ''perhaps erroneously.''

We are of the opinion that the commissioner was not warranted in treating any portion of plaintiffs' claim as barred for failure to file a claim. When the commissioner took possession of the association on March 4, 1939, plaintiffs had performed only a portion of their services and their agreement with the association had been only partially executed. In fact, plaintiffs' services continued for more than three years thereafter on the tax matters for 1934 and 1935, which matters were the subject of the original agreement, and also on the tax matters for years 1936, 1937 and 1938, which were not covered by the original agreement but were the subject of later agreements made with plaintiffs by the commissioner.

When the commissioner took possession, his powers with respect to executory contracts of the association were prescribed by section 13.13 of the Building and Loan Association Act. That section provided that ''the commissioner may in his discretion . . . (4) within six months after obtaining knowledge of the existence thereof, disaffirm any executory contracts (including leases) to which such association is a party, and disaffirm any partially executed contracts (including leases) to the extent that they remain executory.'' The commissioner did not disaffirm plaintiffs' contract, or any part thereof, but, on the contrary, the commissioner ratified and adopted the entire contract as his own. This was entirely proper as contracts of this type are ordinarily considered entire and indivisible. (See *Bartholomae Oil Corp.* v. *Oregon Oil Etc. Co.*, 106 Cal.App. 57, 64 [288 P. 814]; *Palmer* v. *Fix*, 104 Cal.App. 562, 569 [286 P. 498]; *Stern* v. *Sunset Road Oil Co.*, 47 Cal.App. 334, 340 [190 P. 651].) We are therefore of the opinion that the effect of such ratification and adoption was to make the entire claim of plaintiffs an obligation of the commissioner as fully as though the only agreement with plaintiffs had been made by the commissioner following the time that the commissioner had taken

possession. ■ The provisions of section 13.16 of the Building and Loan Association Act, requiring the filing of claims, clearly show in express terms that they relate only to "persons having claims against it (the association) as creditors." They should not be applied to persons whose claims are claims against the commissioner. (See *Estate of Broome,* 162 Cal. 258 [122 P. 470] ; *Enscoe* v. *Fletcher,* 1 Cal.App. 659 [82 P. 1075] ; Tardy's Smith on Receivers, § 596.) The trial court found that plaintiffs filed no claim but further found "that said contract was an indivisible, continuous, executory contract, not capable of being divided as to time, results accomplished, or in any other particular . . . ," and that the commissioner ratified and adopted the contract in its entirety and that plaintiffs were not required to file any claim. We believe those findings and the conclusion of the trial court that no part of plaintiffs' claim was barred are unassailable.

■ Defendant also urges that the agreement between plaintiffs and the commissioner was invalid because it was not under seal. He cites and relies upon section 13.16 of the Building and Loan Association Act which provides, "The commissioner may under his hand and official seal appoint one or more special deputies to assist in the duties of liquidation and distribution under his direction and may also employ such special legal counsel, accountants and assistants as may be needful and requisite and fix the salaries and compensation to be allowed and paid to each." In our opinion, the words "under his hand and official seal" refer only to the appointment of special deputies who act for and represent the commissioner. The section thereafter continues as follows: ". . . *and* may also employ such special legal counsel, accountants and assistants. . . ." If the section were given the construction for which defendant contends, then no person employed thereunder by the commissioner in even a minor capacity could collect any wages unless his employment was evidenced by an instrument executed by the commissioner "under his hand and official seal." We cannot approve such construction. It was not the construction placed upon the section at the time that the commissioner ratified and adopted the original agreement and it was not the construction placed upon the section at the time the

answer was drawn, at which time the validity of the agreement with the commissioner was admitted. Defendant further urges in his opening brief that the agreement between plaintiffs and the commissioner was invalid because the commissioner did not "fix" the compensation. We believe, however, that this point is determined adversely to defendant by the case of *Hill* v. *Bank of San Pedro*, 41 Cal.App.2d 595 [107 P.2d 399]. The only case cited by defendant on the subject is *Dougherty* v. *Austin*, 94 Cal. 601 [28 P. 834, 29 P. 1092, 16 L.R.A. 161], which case is not in point. The only language in the case last cited which can be considered as helpful to defendant is found in the dissenting opinion. We therefore find no merit in the claims of invalidity.

 Contrary to the position taken in the opening brief, defendant states in the closing brief that the commissioner "acting in good faith fixed the compensation" at $60,000. He therefore apparently argues that the amount so fixed was binding upon plaintiffs unless such action on the part of the commissioner was arbitrary, unjust or inequitable. He states that the action of the commissioner "stands unchallenged by the findings" and that there is no evidence to show that the action of the commissioner was "unreasonable." It is a sufficient answer with respect to the findings to state that our reading thereof leads us to the conclusion that said findings were ample to show that the action of the commissioner in fixing a fee of $60,000 was arbitrary, unjust and inequitable. With respect to the evidence, we need only refer back to the testimony of Mr. Janin, the commissioner's own expert, to show that the evidence fully sustained those findings.

 The remaining claim of defendant is that plaintiffs could seek relief only "from the judge supervising the liquidation." Defendant cites no authority in point and we know of none. It is stated by plaintiffs, and not denied by defendant, that plaintiffs requested the commissioner to have the court in charge of liquidation pass upon their claim and that the commissioner refused to do so. The case of *In re Union Building & Loan Assn.*, 16 Cal.App.2d 301 [60 P.2d 562], clearly indicates that a creditor of the association or of the commissioner must resort to an independent action to enforce his claim and that he cannot have his claim adjudicated in the court supervising the liquidation, except perhaps in the event that the commissioner invokes the action

of that court for that purpose. We therefore believe defendant's claim of lack of jurisdiction on the part of the trial court is without merit.

For the reasons stated, plaintiffs' motion for leave to take additional evidence is denied and the judgment is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing was denied October 13, 1944, and appellant's petition for a hearing by the Supreme Court was denied November 9, 1944. Gibson, C. J., did not participate therein.